Joseph H. Gunster, Assignee for the benefit of Creditors of the Scranton City Bank, Appellant, *v.* George A. Jessup, William H. Jessup, Ellen B. Jessup, sole heir and representative of Albert Beardsley, deceased, and Harriet F. Throop, Theodore G. Wolf and Everett Warren, executors of B. H. Throop, deceased.

*Bond—Payment—Banks—Cashier—Suretyship.*

In an action by the assignee of a bank against the cashier of the bank and his sureties on his official bond, to recover the amount of certain items of the cashier's defalcation, where the cashier owed the bank in addition to the defalcation, and it appears that he had been indicted, and that his friends, including the sureties, had raised a large sum of money for the purpose of discharging his entire indebtedness to the bank, and it also appears that the payments made by the sureties were largely in excess of the whole penalty of the bond, and had been actually applied to the extinguishment of the cashier's debt, and where there was a question whether the amount of the cashier's indebtedness exceeded the amount of the money thus paid to the assignee, there is no error in submitting to the jury the question whether the bond had been paid or not.

Argued Feb. 23, 1899. Appeal, No. 396, Jan. T., 1898, by plaintiff, from judgment of C. P. Lackawanna Co., Jan. T., 1891, No. 495, on verdict for defendants. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ. Affirmed.

Assumpsit on a bond of suretyship. Before ALBRIGHT, P. J., of the 31st judicial district, specially presiding.

At the trial it appeared that George A. Jessup had been cashier of the Scranton City Bank, and defendants had given the bond sued on, with the other defendants, as sureties to secure the faithful performance of his duties. In 1889 the bank made an assignment for the benefit of creditors, and it turned out that Jessup was not only largely indebted to the bank, but that he had been guilty of a defalcation which originally amounted to between $7,000 and $8,000.

The items of defalcation claimed for were $1,000 withdrawn from the bank, the transaction being concealed by changing the figures in the books; $1,000, $2,000, $1,600 and $1,800 were for moneys obtained on his notes which were subsequently destroyed, or lost through his negligence, and $172.42, the amount of a note of Hugh Miller, which also disappeared, and which Miller testified that he paid to the cashier.

Other facts appear by the opinion of the Supreme Court.

The court charged in part as follows :

[You will consider, gentlemen, that while there has been much evidence here of large and varied indebtedness of George Jessup to the bank on this bond in this action against George Jessup and his sureties, there can be no thought of recovering for George Jessup's debts—I mean claims which were simply debts of his—but there can be a recovery and a recovery only for breaches of duty on his part as cashier, and which resulted in a loss to the bank. For that these sureties are liable, and not for any debt outside of that that he might have been liable for.] [5]

The plaintiff's counsel has stated, and that has been the attitude of the plaintiff here through this trial, that the grounds upon which it seeks to recover by your verdict is for six items to which reference has often been made in this trial. If the plaintiff has made out liability as to any one of these items, you will allow it with interest from the time the loss accrued to the bank down to this time. You can allow for those items that are proved and to the extent that the bank has suffered loss, and reject others where no such loss had been shown. I will mention to you, for fear that I should forget it at a more appropriate point in these instructions, that even if the cashier did an act which was improper, or even dishonest, but which did

not result in a loss to the bank, then as to that there can be no recovery. To illustrate what I have just now said: [You remember as one of the items of claim is based upon the alleged change of the figures representing on the bank books the value of its real estate, it is charged that there was a changing of the figures in that regard from 12,000 odd hundred dollars to 13,000 odd hundred dollars. Even suppose you should believe that George Jessup made that change, and made it improperly, unless you further find that that improper act of his resulted in a loss to the bank, you would not award anything against these defendants for that. But as to that item the plaintiff's allegation is that it was simply the foundation of a dishonest scheme by which George Jessup sought to withdraw from the bank and appropriate to himself $1,000, and that by various entries and pretended credits and drafts, and one thing and another, he attempted to cover that up, and that the result was that he got that $1,000. Well, if that is proved, then there would be liability for that under the bond.] [6] . . . .

[Now, gentlemen, the parties to this action, for reasons satisfactory to themselves, and no doubt correctly, have not put in evidence certain matters, which, in the court's estimation, would have made the case somewhat plainer. I do not remember that it is shown in this case exactly how this bank was incorporated, nor whether it had any special provisions by its charter or by-laws respecting the duties of cashier, or the liabilities and obligations of directors. So much we do know, that the corporation, the bank, had directors, had a cashier, had a president, a vice president and a secretary.

In order that you may decide whether as to any one of the items of claim made the defendants, the parties to that bond are liable, you must, of course, have some conception as to what the duties of George Jessup as cashier were, because if you have no notion or information as to what his duties as cashier were you cannot say whether he violated the obligation faithfully to perform his duty in any given transaction.] [7] While we know nothing of any special provisions, as I have stated to you a moment ago, yet we can safely state to you that the cashier of the bank is a general executive officer, and he is vested with the power of managing the bank's concerns. He is an executive officer, by which is meant that he is the officer or one of

them who actively carries on the bank, and his duties and powers are distinguished from those of directors inasmuch as they do not actually carry on the transactions of the bank, but control its affairs by giving directions, etc., to the cashier. You can take it as the law, that as cashier in this case, George A. Jessup was bound to exercise reasonable skill and ordinary care and diligence in the performance of his duties, if he did that, then his sureties are not liable. While if during the time he was cashier he failed in that regard, then he and his sureties are liable on the bond here in suit.

Now, gentlemen, as to these several items claimed for, to a great extent the establishment of them depends upon book entries which you will have to consider. The plaintiff's claim does not depend entirely upon book entries, but to a great extent, where it is proved that an entry was made by Jessup, that it was in his handwriting, there, of course, he would have knowledge of the same. Where he, as cashier, purported to make a statement about some material matter concerning the assets of the bank, there, of course, he would be held liable for that act. And you will observe, gentlemen, that he being the executive officer of the bank, and it having been testified—and it is for you to say whether it is proved—that he had control of all its concerns, cash and papers, and, of course, was concerned with the keeping of the books, it is for you to say where book entries that are not proved to have been made by him, yet if he was related so directly to the affairs of the bank, its money and its assets, while George Jessup was cashier, that you are convinced that he knew of the same, or by the exercise of ordinary care and diligence he ought to have known of them, then you can say that he is affected by these entries, even although it is not proved that he made them.

Now, gentlemen, Mr. Gunster was appointed in May, 1889, assignee for the benefit of creditors of this bank. . . .

By the assignment the bond in suit became in law the property of J. H. Gunster, the assignee, . . . . If there had been anything paid by the parties to the bond, George Jessup or his sureties, ordinarily it would have come to the assignee. But it appears that in this case there were other parties that acted, and no doubt acted with the knowledge of these defendants, and also with the knowledge of Gunster.

It appears that not long after the assignment there was a gathering, of a public nature, of the depositors of the bank, and they appointed a committee to act for them, and that committee consisted of Judge Lewis, Mr. Levy, Mr. Kramer, Mr. House and Mr. Conwell, and they took action in the matter, as you have heard testified to, and that they did act is not disputed. It seems·that certain of the gentlemen who were directors at the time of the assignment also concerned themselves and acted together. Among their number was Mr. Merrifield, Victor Koch, Charles Tropp, Henry Armburst and Morris Goldsmith. Now, gentlemen, after the assignment had been made the directors of the assigned bank had nothing to do with the settlement of the estate.

But it seems that these directors, probably with a view of securing the payment of the depositors, did act, and they took part in transactions which figure in this case. And it appears that Judge Willard, a member of this bar, acted for George Jessup, and that he acted for Dr. B. H. Throop, and to some extent probably for Judge William H. Jessup, one of the sureties, and that Judge William H. Jessup, another member of this bar, acted for Albert Beardsley. Then, gentlemen, it is a fact in this case that sometime in the fall of 1889 George A. Jessup was arrested on a criminal charge, and it was said that an indictment was found in the criminal court against him;. . . . . and George Jessup was in jeopardy in the criminal court, and it is very evident that some of the parties, defendants, were concerned about him, and desired his release from that position of danger.

Now, gentlemen, this case was presented before the court and you, generally speaking, in this way : The plaintiff proceeded to show liability on defendants' part for these six items, to which I have made some reference. Then, when the defendants came to present their case they proved to you that there had been received by the assignee from the defendants a very much larger sum of money than the plaintiff claimed here. They proved that upward of $100,000 had been paid, including a certain item of $73,000 which was realized out of George Jessup's property, and then it appeared—and that is no doubt the fact—that George Jessup was liable on a number of notes representing a large sum of money, $100,000 more or less.

Now, you will observe, gentlemen, that there is evidence not contradicted; in fact, it can be taken as facts in the case: that some of these defendants, some of these sureties, paid money which went into the hands of Gunster, assignee, and it is claimed on defendants' part that they paid more than the bond. You will bear this in mind, that under this bond the sureties were not liable indefinitely and for any amount that George Jessup might be a defaulter for; they were liable only to the extent of their bond, $25,000, and even if he had improperly appropriated $50,000 or $100,000, and all that had been proved, the sureties who bound themselves in $25,000 would be bound only for that sum, and when they or any of them had paid, on account of their liability as sureties, a sum amounting to $25,000, then they would be discharged even though George Jessup was liable for irregularities to a much larger sum. And when I say if they had paid, I mean that they have parted with money that came into the hands of the assignee, and that was intended for the purpose of a payment on their obligation as sureties.

Now, it is said, and no doubt is a fact, that Judge Jessup paid 11,000 odd hundred dollars—you remember he is one of the sureties—and that Mr. Lewis, a committee of the depositors, after deducting a commission, paid $10,620 of Judge Jessup's money which went into the hands of Gunster, and that is admitted by the plaintiff. Then $35,000 was made up chiefly by the sureties, and that found its way into the hands of Gunster, the assignees. That $35,000 was made up of 15,000 odd hundred dollars, being contributed by Beardsley, the surety, and $11,000 was raised in substance by Throop, one of the sureties, and so you will observe, gentlemen, that at this stage there was paid by the sureties, Judge Jessup, Mr. Beardsley and Dr. Throop, more than $25,000. And if that was paid on account of this liability as sureties, then it discharged them. . . . But the allegation of the plaintiff is that those moneys that were then paid,—all that were paid by Judge Jessup, by Mr. Beardsley and by Dr. Throop,—were paid, not on account of the liability on the bond, but for other debts of George A. Jessup to the bank.

[Where a party pays money, as these sureties paid money, the fair inference is that they pay in discharge of what they are bound for and not for anything else. If the bank had

many claims against George Jessup—but Judge Jessup, Mr. Beardsley and Dr. Throop were only liable for certain ones, and they paid money and said nothing upon what account they paid—I say a fair inference and an inference which you may draw would be that they paid on account of what they were liable for, and not as a matter of friendship, to pay a debt which they were not liable for. But after all, you are seeking for the truth, for the fact, as to what these sums thus paid by the sureties were paid for. It is urged that they stepped out of their way and paid on debts of George Jessup for which they were not liable, because they wished to free him from the consequences of his alleged misdemeanor, and to get him clear from the grasp of the criminal law, and there is considerable on that point, gentlemen.] [8] . . . .

The bank and its assignee had a right to receive from George Jessup or anybody who chose to pay for him as a friend, if they chose, as much as George Jessup owed, but they could not make use of the criminal prosecution, which practically was instituted by the bank, to realize money which George did not owe; and if this money was realized beyond his indebtedness, say outside of what the bond covered, and these defendants paid it and it went into the hands of the assignee, then it would be a payment on account of this very bond, that is if it overpaid the other amounts.

But, gentlemen, there is a dispute as to what these sureties paid on account of. They assert that they paid in discharge of this bond. Well, the plaintiff says you can find that they paid matters not covered by this bond, either because they wanted to see George Jessup clear of debt or most likely because they wanted him released from the criminal charge, and what the payment was on account of is for you to decide. I do say to you, gentlemen, that you can start with the inference that when these sureties paid, they paid what they owed; they paid on account of what they owed. But that is not conclusive, and if all the evidence satisfies you that they did not pay on that account and on that footing, then you will let the truth prevail, and if they paid on account of the other debt, it will be so credited by you.] [9]

It appears that at the time of these difficulties George Jessup had coal leases and options, and being willing that in relief of

his sureties and to pay his own debts there should be realized thereon, he transferred the same to Judge Lewis and Dr. Throop as trustees to turn the same into money and to pay debts, and to pay debts to the bank. . . . That trust was to pay the indebtedness of George Jessup to the bank other than the indebtedness he owes as cashier—that is what his sureties are bound for—and after that to pay the indebtedness of said Jessup to the bank as cashier if any is left. Well, upon that score, there was realized something like 73,000 odd hundred dollars, . . . . that went on account of the indebtedness which was not covered by the bond.

Then there are two papers in evidence which are material; the one is dated October 4, 1889, and the other October 7, 1889; but it seems that either the two papers were made together, or the understanding was that both of them should constitute one contract.

In the one dated October 7, it is set forth that it is agreed between Tropp, Koch, Armburst, Goldsmith and Merrifield, parties of the first part, and Lewis, Kramer, Levi, House and Conwell, of the other part, that in consideration of Benjamin Throop releasing and canceling $25,000 of the amount due him as depositor in the Scranton City Bank, that Lewis and Throop, trustees, shall pay over the amount realized from the sale of the Jessup coal leases, and the balance as soon as collected, less expense of sale, and that an arrangement has been made with the attorney of George Jessup for the payment of an additional $35,000 to the assignee of said bank to be applied on account of said Jessup's indebtedness, and for the further consideration of $1.00 paid by said parties of the second part, said parties of the first part do hereby promise and agree that they will make good the assets of the said Scranton City Bank, now assigned to said Joseph H. Gunster, so that the same shall pay to the depositors of said bank their just claims in full; that is to say, if a sufficient sum cannot be realized from the assets of said bank to pay said deposit indebtedness, they agree to supply the deficiency from their own resources. And the said parties of the first part, that is the directors, do hereby agree that they will negotiate the assets of said bank or advance the money thereon to pay in any deficiency, as the case may be, and will pay to the said assignee a sufficient amount of money so that,

with what he may have on hand, he will be enabled to pay sixty per cent of the amount of the indebtedness to depositors of said bank on the first day of November next and ten per cent on the first day of each and every month thereafter until the depositors shall be paid their just claims in full.

Then the writing dated on October 4, 1889, between Tropp, Merrifield, Armburst, Koch and Goldsmith, of the first part, and Benjamin H. Throop of the second part: " Whereas the parties of the first part have this day executed an agreement with L. M. Kramer and others, as trustees for the depositors of the Scranton City Bank, conditioned on their part to pay said depositors in full, now wherefore, in consideration of the agreement of the said parties of the first part to pay said depositors as above recited, Benjamin H. Throop agrees on his part to assign to the said parties of the first part twenty-five thousand of his deposit account now standing in his name on the books of said Bank and does hereby assign, transfer and set over to the said party of the first part the sum of $25,000 of his said deposits, and in consideration thereof the said parties of the first part agree to fully indemnify and save harmless the said Benjamin H. Throop on account of any and all liability that he may be under to said depositors."

Gentlemen, it has been proved that when the assignment was made that Benjamin H. Throop had as deposits in the bank upwards of $59,000, so that his deposits were of value, he had a right to claim from the assignee payments as a creditor. If the bank's assets were enough to pay all the depositors in full, then his $59,000 of deposits were worth $59,000; if there was enough to pay half, they were worth half that sum. How much was paid or could have been paid then we are not informed of. There is no proof here that the assets of the bank were not sufficient to pay the depositors in full; I remember no testimony, and if you find none then you can say that these deposits were worth their face value.

Well, Benjamin H. Throop parted with some $11,000 of his deposits in a way I need not explain to you to make up the $35,000 to which I have made reference, but by the writing I have read last he assigned to Merrifield and others acting with him $25,000 of these deposits. Now, gentlemen, the paper I have read last I construe, as I have been asked to do, to have

the effect of a transfer by Throop to Merrifield and his associates of that $25,000 of deposits; it means that, and by virtue of this writing they could take it and do with it what they pleased, unless you find from the evidence, from the action of Merrifield and those with whom he acted and what was said and done, that there was some other purpose. It is said that Throop transferred the $25,000 to Merrifield and others because of his liability, or because of their saving him harmless from his liability to the depositors. Well, there are no facts in the case from which we can tell what his liability to the depositors was, but he chose to say so and to so act, and we can take him at his word.

Now, gentlemen, it does appear that after there was that transfer to Merrifield and others, Merrifield and the assignee of the bank took certain action about that deposit, that $25,000. The testimony of Dr. Throop, who is now deceased, taken while he was living on the former trial, has been read respecting it, and he was asked about it, and I believe he said that the purpose of his assigning the $25,000 deposits was to absolve him from payment on his stock and to release Jessup, and Mr. Gunster said that Merrifield directed him (Gunster) to charge the amount to Throop and to credit the directors. Well, Gunster, the owner of all the assets of the bank and the man whose duty it was to collect and to pay out, has said that to you.

It is urged on the part of the plaintiff that the $25,000 was to remain the property of Merrifield and his associates, and they could do with it what they pleased, and that the canceling of it on the books of the bank as a liability of the bank had a bearing only on their own transaction and undertaking to pay the depositors. It also appears that there was assigned to Merrifield and the gentlemen acting for him a number of deposits, that is, they bought up claims.

On the part of the defendants, it is urged that that $25,000 was really a payment by Dr. Throop on account of George Jessup's debt. Now, gentlemen, it is proved, it is admitted by the plaintiff, that taking what was realized on George Jessup's coal property, and what was raised by Judge Willard for the defendants and others, and what Judge Jessup paid (the $10,620), all that realized something like $119,000, and the defendants urge that George Jessup's debts of every kind that

have been proved did not amount to more than that sum, or a trifle more, and at the highest did not amount to over about $136,000. It is said that nobody even testified that they amounted to that much, but that is what Gunster reported to some one that they amounted to.

[Now, gentlemen, the defense claim that with the 119,000 odd hundred dollars paid and with the $25,000 Throop deposits there would be made up a sum of $144,000, and that that would more than pay all that George Jessup owed upon any theory, and that, therefore, the plaintiff cannot recover. We do say to you that there is no evidence in this case from which you could find that all the debts actually proved by competent evidence here of George Jessup of every kind amount to $144,000. So the great contention here is, what was that transaction of the $25,000 deposits? Did it go to pay George Jessup's debt or did Dr. Throop part with it for some purpose satisfactory to himself, to Merrifield and his associates, and they made use of it for their benefit because, after they had it at the hands of Dr. Throop, if they used it in their transactions with Gunster in such a way that it paid a debt of the bank, and that they were willing that that should be done, then, in such case, Throop who owned the fund, had parted with it, and if through Merrifield and his associates it found its way into the coffers of the bank, then it is to be considered as a payment.

Now, gentlemen, if this assigned bank had enough assets to pay in full, and a man had a deposit there of $25,000 and he gave that up and agreed that it should be canceled, it benefited the bank just as much as if he had carried $25,000 in money and put it into the hands of the assignee. If a debt to the extent of $25,000 was canceled, the result was as I have just intimated to you.] [10]

[But, gentlemen, unless the defendants have satisfied you that the whole arrangement between Throop and Merrifield and those who acted with him was that that was to go to pay George Jessup's debt, and that it found its way into the hands of the assignee Gunster for that purpose, with the assent of Merrifield and those for whom he acted, then it is to be taken as not having paid a debt of George Jessup, and it remains in different shape, it may be the property of Merrifield and his associates.

Well, gentlemen, you will inquire and decide in the first

place, whether the bond of $25,000, upon which these defendants are liable, has been paid by money contributed by them or any of them that found its way into the hands of the assignee and that was intended by the parties to go on the debt represented by this bond, and if you find that it has been thus paid, then you will find a verdict for the defendants.] [11]

Verdict and judgment for defendants.   Plaintiff appealed.

*Errors assigned* among others were (5–11) above instructions, quoting them.

*Samuel B. Price*, with him *Charles H. Welles*, for appellant, cited Bissell v. First Nat. Bank of Franklin, 69 Pa. 415; Boone on the Law of Banking, sec. 104; Barrington v. Bank of Washington, 14 S. & R. 420; Bank of Washington v. Barrington, 2 P. & W. 27.

*Everett Warren* and *James H. Torrey*, for appellees.

OPINION BY MR. JUSTICE GREEN, July 19, 1899 :

It must be constantly borne in mind that this is an action only on the official bond given by George A. Jessup for the faithful performance of his duties as cashier of the Scranton City Bank.   The penal sum of the bond was $25,000, and the action is brought against the cashier and his sureties.   The bank having made an assignment for the benefit of creditors to the present plaintiff, he brings this action to recover six items of alleged loss to the bank by reason of the defalcations or other misconduct of the cashier while he was filling the office.   The amount alleged to be thus lost to the bank is some $7,000 or $8,000, which with interest added would amount at the time of the trial to something over $13,000.   The defense set up by the sureties is, that they, in their capacity as bondsmen upon this bond, paid money to the assignee or money that was received by him, to an amount greater than the whole penalty of the bond in discharge of their obligation as such bondsmen, and therefore there can be no further recovery against them, no matter what may be the amount or character of the defaults of the treasurer.   If this defense was true as a fact the plaintiff could not recover.   On the trial the substantial controversy

turned upon the question whether the defense was true as a matter of fact, and the learned court below, after a very careful explanation of the issue and the matters in controversy to the jury, left to them the decision of the question. The final instruction to the jury was in these words: " Well, gentlemen, you will inquire and decide in the first place, whether the bond of twenty-five thousand dollars, upon which these defendants are liable, has been paid by money contributed by them, or any of them, that found its way into the hands of the assignee and that was intended by the parties to go on the debt represented by this bond, and if you find that it has thus been paid, then you will find a verdict for the defendants. If you find that the bond has not been paid then you can inquire whether it has been paid in part; for instance, if the whole has not been paid, but a part of the bond has been paid, then the bond stands good for as much as is unpaid, and if that amount is less than what the plaintiff has proved here that he is entitled to under the bond, you will find in favor of the plaintiff only as much as he is entitled to. But if you find that the bond has not been paid, then you will inquire whether the plaintiff has made out his claim in whole or in part."

It was fully shown on the trial that the several persons who were bondsmen had, in point of fact, paid money to a much larger amount than $25,000, and it was also shown that the whole amount of the money thus paid came to the assignee. But there were some complications, and some questions that were developed by the testimony growing out of the fact that much larger and other sums were paid which also came to the assignee, and in which payments other persons than these bondsmen participated. The cashier had subjected himself to a criminal liability by his transactions in conducting the affairs of the bank, and an indictment was found against him for those criminal acts. In order to avoid the consequences of these criminal acts a large amount of money was raised by friends of the cashier, and by realizing sales of certain coal options which he held and turned over to two trustees to act for him. It was claimed by the defendants that the total of the sum raised and paid over to the assignee was about $144,000, and it was claimed by the plaintiff that the total shortage account of the cashier was $168,000. A great deal of testimony was taken in the

development of the various contentions of the parties upon these subjects, and especially upon the point whether the moneys paid by those persons who had signed the cashier's bond as sureties were really paid in discharge of their obligations as bondsmen. The allegation that the total shortage of the cashier was $168,000 is denied absolutely by the defendants, and it was fully testified on the trial that it was never claimed to be more than $145,000 at the outside, and that when inquiry was made of the assignee as to what was the total amount he replied that it was $136,000. It was also testified that the money that was raised and paid by the defendants was raised for the purpose of paying off and discharging the entire indebtedness of George A. Jessup to the bank. While it does not appear that there was any specific appropriation of any particular payments made by the bondsmen, it did appear very clearly that the payments they did make were largely in excess of the whole penalty of the bond, and the payments being actually applied to the extinguishment of George A. Jessup's indebtedness to the bank, we think the learned court below was entirely right in submitting the question whether the bond had been paid or not to the jury for their decision. It is not necessary to review the testimony in detail nor to dwell upon its various aspects. It certainly did raise the question of actual payment of the whole amount which could in any event be claimed under the bond, and the jury has decided that question in favor of the defendants. This verdict was satisfactory to the learned judge who tried the case, and it is satisfactory to us. The case was twice tried, and the first verdict being against the defendants was set aside by Judge McPherson who presided at the trial, because he regarded it as against the weight of the evidence. After a careful examination of the testimony we are of opinion that the verdict on the last trial was just and proper. We do not think that there is any error on the part of the court in the matters covered by the several assignments, and they are therefore dismissed.

Judgment affirmed.